**ELLIS M. JOHNSTON III**
California State Bar No. 223664
CLARKE JOHNSTON THORP & RICE PC
302 Washington Street, Suite 626
San Diego, CA 92103
Telephone: (619) 756-7632
Email: trip@cjtrlaw.com

Attorney for Mr. Pilligua

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

(THE HONORABLE JANIS L. SAMMARTINO)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>PEDRO PILLIGUA IDUARTE,<br><br>    Defendant. | CASE NO. 21cr0896-JLS<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>DATE: FEBRUARY 21, 2025<br>TIME: 9:00 A.M. |

Pedro Pilligua has been buffeted by difficult economic circumstances his entire life, yet every time he has bucked up, worked hard and built himself and his family back a little stronger. But the unprecedented impact of the COVID pandemic was too powerful for even him and the proud life he'd built around fishing. Faced with no good options, the needs of his employees and their families as well as the incessant pressure of the cartels on cogs like him to keep their drug wheels spinning, Mr. Pilligua gave in, not through greed or malice, but with the best of intentions, only to lose everything including their home and business. For four years, he and his wife have endured pretrial custody in two foreign countries, far from their children and for Mr. Pilligua, far from any chance of meaningful treatment for his cirrhosis. It has been long enough and sufficient punishment in this case under these difficult circumstances.

# THE PERSON BEFORE THE COURT

## A. Background

Life has never been easy for Pedro Pilligua. He was born in Ecuador to a humble family, who like many others there struggled financially. He had to give up school and start working when he was only twelve to help put food on the table. Nevertheless, Mr. Pilligua stayed busy and started making a life of his own and raising his family when, according to the New York Times, Ecuador's economy "broke" in the late 1990s.[1] It was so bad in Ecuador at the time that Mr. Pilligua and his wife felt compelled to flee and were accepted into Spain as economic asylees.

Rather than shedding tears or wallowing in misery, Mr. Pilligua looked around for opportunities, put himself to work, and over the course of the next decade saved money for an eventual return to his homeland. But another unprecedented economic crisis struck Spain as hard or harder than any other country in the world when the Great Recession landed with a plunge into what has been reported as a grotesque "Hell" for those trying to survive there economically.[2] Facing economic ruin for the second time in a decade, and now with a wife and 8-year-old son, Mr. Pilligua yet again sought economic relief and another new beginning back home in Ecuador.

With financial support and loans from friends and family in Spain and Ecuador, his own savings from a decade of frugal living and hard work, as well as some bank loans, Mr. Pilligua charted a new course upon his return, was able to purchase a commercial fishing boat that needed a lot of attention. But hard work paid off, fishing was good, and Mr. Pilligua put everything he earned back into his business, growing it

---

[1] *See* "Ecuador, Swept by Inflation and Unrest, Brakes the Economy," https://www.nytimes.com/1999/03/13/world/ecuador-swept-by-inflation-and-unrest-brakes-the-economy.html (March 13, 1999).

[2] *See* "To Hell and Back: Spain's Grotesque Recession and Its Surprising New Economy," https://www.theatlantic.com/business/archive/2013/10/to-hell-and-back-spains-grotesque-recession-and-its-surprising-new-economy/280678/ (October 18, 2013).

to create his own "fleet" of boats. Mr. Pilligua and his wife had a second child, a daughter, they began building their own home, and while business was good, the overhead was high, and they relied on their good relations with the local bankers to maintain lines of credit that helped keep their operations going.

By the time that the Pandemic hit, Mr. Pilligua and his wife owned three commercial fishing boats, employed several dozen men including boat captains and crewmen, and through the graces of Mr. Pilligua's relationship with local banks were able to utilize lines of credit to smooth out the customary gaps in the fishing industry between income and expenses. But even with his incredible work ethic and reputation in the community as a hard working and successful businessman, neither Mr. Pilligua nor any other ordinary human was prepared for what was to come.

### B.     The Offense

There's no dispute that prior to this offense, Mr. Pilligua had worked incredibly hard, not to build a "drug trafficking organization," but instead to build boat by boat, repair by repair and deckhand by deckhand, a legitimate and respected fishing business in his home port of Manta. Because he was a good fisherman and businessman, Mr. Pilligua was able to obtain and maintain larger, long-range boats that could reach the fertile fishing grounds around the Galapagos Islands. And when the fishing was good and the markets were hungry for the fish he caught (mahi mahi was his prime catch), Mr. Pilligua was successful. But every trip required significant upfront expenses, and every year required even more significant repair and maintenance costs. And then, of course, there were the deckhands and crewmen of his boats to pay.

In ordinary times, Mr. Pilligua was able to handle the ebb and flow of income, expenses, and occasional bad luck through lines of credit with local banks. Everyone adored Mr. Pilligua in his town, and the banks were well aware of his honesty and work ethic. If Mr. Pilligua and his wife were willing to use their home that they had built brick by brick over the years to secure any loans, the banks were ready to oblige. But the

COVID 19 pandemic that gripped the world in early 2020 was unlike anything anyone in Manta or the rest of the world had experienced in living memory.

The Pandemic wasn't like Ecuador in 1999 when the economy "broke" under the weight of inflation, nor Spain's walloping by the Great Recession in 2008; this was different. Nor was it a situation where the fishing wasn't good or the fish had disappeared. Rather, it was an unprecedented case where the economy completely ceased to exist for an unknown, indefinite period of time, and with little warning. What were fishermen like Mr. Pilligua supposed to do?

For Mr. Pilligua, the original answer was obvious: keep fishing. Maybe the markets in the United States (where virtually all his fish were sold) would open back up, and the fish wouldn't rot on the docks, unclaimed by the fishmongers and brokers who had nowhere to ship them. But this was not an easy decision. Mr. Pilligua's boats didn't go out to sea on short day trips; they went out to sea over hundreds of miles for a month at a time. The overhead was expensive. Mr. Pilligua estimates that each trip out for his boats cost him at least $30,000 in fuel, wages and expenses. And each time he returned to a closed market for his catch in the North, those costs were on him.

Mr. Pilligua's boat captains and crews were all for making each renewed effort; their own livelihood and that of their families depended on it. Mr. Pilligua felt that pressure, and he sought to extend his lines of credit with the banks to keep the boats going out in hopes of a change of luck with the markets. Indeed, as he reported to Probation, Mr. Pilligua estimates that by the time he left Ecuador, he was at least half a million dollars in debt. PSR ¶ 103. But if the pressure of supporting his employees through these unprecedented times wasn't enough to weigh on Mr. Pilligua's conscience, there was another front of pressure that was equally, if not more, unbearable for him.

Not all the fishermen in Manta were as successful as Mr. Pilligua or had the bigger boats that could reach the fertile fishing grounds off of the Galapagos. But as the PSR recounts, the real drug smuggling organizations based in Columbia needed to find a

way to get their drugs out past the Galapagos islands in an attempt to avoid law enforcement, and in people like Mr. Pilligua, they saw a solution to their problem. PSR ¶¶ 10-12 (noting that "Without the commercial fishing vessels acting as LSVs, it is not possible to ship cocaine on the SOG route, as the DLVs do not have the necessary capacity for fuel storage to make the journey unaided"). Neither Mr. Pilligua nor any of the other boat owners sought out these DTOs; the DTOs made it clear that they intended to take advantage of the situation.

The DTOs understood and took advantage of the economic stresses created by the Galapagos fishing model. Just for an owner like Mr. Pilligua to send his fleet out on a one-month expedition required significant upfront cost for expenses, usually around $30,000. If a fishing trip wasn't successful, the owner still had to endure covering those expenses. In the usual back-and-forth of the years and fishing seasons, an owner could deal with such risks. But the pandemic presented a whole different situation. Even if the fishing was good, there was no guarantee that the markets would be open to take the fish and send them anywhere for profit. But if the boats didn't go out, everyone who worked in the industry was guaranteed to go unpaid and worry about what to do next.

The DTOs pounced on this COVID reality. They offered the boat owners $25,000 up front to take out extra fuel for the DTOs' small go-fast boats and told the owners that they would get more if and when loads successfully completed the journey much further down the line. It was devious and effective: offer just a little less than actual expenses to boat owners desperate to keep their boats in business and promise enough more to cover the rest of expenses and some profit in the future. It was nearly impossible to resist as the boat owners had to endure their growing debts to the banks and the growing, vocal pain of their employees and crews, many of whom were already living at subsistence levels.

As the case agent candidly told Mr. Pilligua during his safety valve debriefing, "many, if not the vast majority of, boat owners became involved" in these refueling deals during COVID "because the fishing industry had collapsed." It wasn't because the

boat owners in Manta were themselves any sort of cartel entity, or that they were greedy or even inclined to engage in such behavior. Rather, faced with the unprecedented effect of the COVID pandemic, they felt that they had little to no other options. Regardless, Mr. Pilligua was tearful in his remorse as he explained to probation that he was proud of everything he had done in the face of adversity up to this point in his life. And never having ever been detained or charged with a crime, he feels horrible for where his actions have led him. With almost four years now in pretrial detention in two different countries, the Court may be able to give a little more weight to his claim that all this time in custody has confirmed that he will never stray from the straight and narrow again.

### C. Family support, health and future plans.

As discussed above, Mr. Pilligua's involvement in this case occurred during the pandemic, some five years ago. And it all fell apart in September 2020 when one of Mr. Pilligua's boats was seized by the Ecuadorian navy and some of his family members were prosecuted locally. The fishing market had not opened back up, he had been struggling financially for over eight months, and Mr. Pilligua and his wife sought refuge in Spain where his son (born in Spain) lived. Unaware of charges in this country, both he and his wife were arrested in 2021, spent about a year in Spanish custody and then three years in custody here.

The financial ruin has been immense. In the best of times, everything that Mr. Pilligua had was heavily financed. Millions of dollars in gross profits over the years still left him with constant debt to be serviced just to keep things going. In custody for some four years now and with no way to service his debts or fight to get back his ships, Mr. Pilligua believes that he has lost everything. As noted above, one of his ships was seized, the others have been repossessed, and he thinks he has already lost his home at bank auction. He still thinks he owes some $500,000 in debts. The future prospects are bleak for a man who spent decades building up a respectable and successful life.

Yet Mr. Pilligua still has hope. His son, now an adult, has managed some success in Spain and fully supports his parents and their eventual release. *See* Exhibit A (letters in support). Nevertheless, Mr. Pilligua is driven to despair every day he spends in custody separated from his daughter, Sofia, a now 14-year-old girl who hasn't seen either of her parents since she was nine years old. Living with an aunt, Sofia has begun to show signs of trauma from being separated from her parents. This mental stress and anxiety come in addition to physical health issues that have plagued her since soon after she was born. Mr. Pilligua cannot even begin talking about Sofia without tears coming to his eyes. The hope that he holds onto is that he can soon be reunited with his daughter. Beyond his immediate family, Mr. Pilligua also enjoys the support of his parents, who, while octogenarians with their own health issues and care needs, write on behalf of their son seeking his release and pledging support for him after Mr. Pilligua spent his entire life since the age of 12 helping to support them.

Lurking in the background, though, is the specter of Mr. Pilligua's cirrhosis. He has received medical attention and medications for this condition since his arrival in the United States, but doctors have advised him that the only cure for this progressing disease is a transplant, something that he has no chance of receiving while in custody. Mr. Pilligua, though, ever proud, always tries to put the best face on this situation and hopes that wherever he ends up, he will have a chance to address his condition better. And if not, he expresses satisfaction with the contentment he will have by being reunited with his family.

**ADDTIONAL SENTENCING CONSIDERATIONS AND REQUESTED SENTENCE**

Mr. Pilligua believes that the nearly four years that he has collectively spent in custody here and abroad for this offense is sufficient punishment in this case. Without even taking into account a variance, the government recommends an 87-month sentence, DE 102, but also agrees that this sentence should be reduced by the amount of time, over 10 months, that Mr. Pilligua spent in Spanish custody for this case. *See* DE 78 at 11 ¶ F. Probation agrees with Mr. Pilligua that a variance is warranted here before even considering that Mr. Pilligua is not subject to the mandatory minimum sentence. PSR ¶¶ 136 (recommending a downward variance of almost seven years before factoring in Mr. Pilligua's safety valve eligibility).

The circumstances of this case warrant a sentence significantly less than what the guidelines call for. The government acknowledges Mr. Pilligua's role as nothing more than "average" in this large transnational trafficking conspiracy. But neither probation nor the government consider the severity of Mr. Pilligua's detention, in a pretrial environment in two foreign countries, or the devastating losses of not ill-gotten gains, but hard-earned assets, that he has suffered as the result of his lengthy incarceration. Taking all these factors into consideration, the fact that the government is really recommending not much more than six years in custody and Mr. Pilligua four, should guide this Court to impose a time served sentence.

I. **Guidelines Calculations**

a. **Mr. Pilligua basically agrees with the government's guideline calculations.**

Mr. Pilligua agrees with the government's guideline calculations as outlined in its sentencing summary chart. DE 102 (establishing a low-end of 87 months before considering any variance).

b. **Mr. Pilligua joins in his wife's arguments for a departure for imperfect duress under § 5K2.12.**

Mr. Pilligua joins in Ms. Alarcon's motion for departure for imperfect duress under U.S.S.G § 5K2.12. *See* DE 100 at 3-4. He also adds that the facts discussed above, particularly the unprecedented effect of COVID 19 on him, his family and his business added to the pressures from the cartels by creating a sort of necessity that in combination warrants a departure under §5K2.0.

## II.     Relevant 3553(a) Factors

### a. Mr. Pilligua's History and Characteristics--§3553(a)(1)

No one disputes that Mr. Pilligua led a blameless, hard-working life for nearly five decades of his life. He saw every challenge that he ever faced as an opportunity to better himself and more importantly, his family. He dedicated every fiber of his being to being a provider, a good person and contributing member of his community. It's hard to imagine him ever seeking out criminal activity on his own. His track history proves that Mr. Pilligua has been too proud to take the easy route to success, which only underscores how difficult circumstances must have been when the dual threats of the COVID 19 pandemic collided with the drug trafficking organizations' need for people like Mr. Pilligua, resulting in the tragedy that destroyed everything he had built through law-abiding hard work.

### a. Nature and Circumstances of the Offense and its seriousness--§3553(a)(1) and (a)(2)(A)

Being involved in any conspiracy to distribute serious drugs like cocaine, no matter how average or minor one's role might be, is a serious offense. But Mr. Pilligua's cog-like role as a floating gas station in this this much larger conspiracy among much

higher level international and high quantity dealers should mitigate his actual conduct in this case.

The government is aware through Mr. Pilligua and other sources that there have been outfits in Manta who simply appeared as "fishing" operations, with the real intent and purpose to use such a front to obscure their true intent to participate in and facilitate these larger drug trafficking networks. No one will claim that Mr. Pilligua, with his well-documented history and reputation as a hard-working and successful fisherman, ever fit such a bill.

### b. The need for adequate deterrence and protecting the public from further crimes by the defendant--§3553(a)(2)(B) & (C)

Mr. Pilligua ironically found himself in this situation because he had achieved success as a legitimate owner of an offshore fishing operation. Losing everything he has spent a lifetime building is a more devastating deterrent for Mr. Pilligua and other proud business owners like him than any amount of time in custody. But adding four years of custody on top of such loss while an adolescent daughter suffers the loss of not one, but both parents is insufferable. It is enough punishment.

### c. Sentencing disparity--§3553(a)(6)

The need to avoid unwarranted sentencing disparities arises in all cases, and it should be stated that every defendant's case is different in many regards. Nevertheless, other defendants in a case like this have received substantially less punishment, even from this Court. *See, e.g., United States v. Macias Reyes*, 21cr1316-JLS (sentencing defendant who ran a boat operation out of Manta to time-served, essentially 15-month sentence). A four-year sentence for Mr. Pilligua would not represent any sort of unwarranted disparity for someone with his background and loss.

## CONCLUSION

Whatever sentence this Court chooses to impose, Mr. Pilligua's life has unquestionably been diminished by this experience. He has lost everything that he has worked so hard to achieve through lawful, diligent work in the face of multiple adversities, the final one being something even he couldn't overcome. It will weigh heavily on Mr. Pilligua for the rest of his life, whether he spends one more day in prison or several more years.

A time served sentence of nearly 48 months in custody represents a significant period of confinement in this case, particular since it has all come during pretrial detention in two different countries. And Mr. Pilligua respectfully requests that the Court impose no more than that here so that he can upon release prove, as he has so many times before after facing adversity that he has value to return to his family and support them while they support him.

Respectfully submitted:

Dated: February 19, 2025

*/s/ Ellis M. Johnston III*
Attorney for Mr. Pilligua
trip@cjtrlaw.com